IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Elkins Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT: 1460 Old Poplar Drive, Baker, Hardy County, West Virginia | Case No. 2:21-mj-*10* |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Matthew Marasco, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the property located at 1460 Old Poplar Drive, Baker, Hardy County, West Virginia 26801 (hereinafter referred to as "PROPERTY") as further described in Attachment A, and for the seizure from the PROPERTY of items as further described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been since September 2019. I am assigned to the Richmond Field Office of the FBI in Richmond, Virginia, and am responsible for conducting investigations pertaining to child exploitation. As part of my duties, I have received training regarding the investigation of Federal crimes including, but not limited to, crimes against children, human trafficking, civil rights, and public corruption. By virtue of my employment with the FBI, I have performed a variety of investigative tasks including conducting arrests and executing Federal search warrants. As a Special Agent, I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7).

1

3.  The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence and instrumentalities of violations of 18 U.S.C. § 2422(b), Attempted Coercion and Enticement of a Minor, and 18 U.S.C. § 2423(b), Travel with Intent to Engage in Illicit Sexual Conduct, are located on the PROPERTY described in Attachment A. There is also probable cause to search the PROPERTY described in Attachment A for evidence and instrumentalities of these crimes further described in Attachment B.

## JURISDICTION

5.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). Specifically, the Court is "a district court of the United States ... that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## RELEVANT STATUTORY PROVISIONS

6.  **Coercion and Enticement**: 18 U.S.C. § 2422(b) provides that whoever, using the mail or any facility or means of interstate or foreign commerce, knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be imprisoned not less than 10 years or for life.

7.  **Travel with Intent to Engage in Illicit Sexual Conduct**: 18 U.S.C. § 2423(b) A person who travels in interstate commerce or travels into the United States, or a United States

citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, with a motivating purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

## **TECHNICAL TERMS**

8.  Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  **"Computer,"** as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

    b.  **"Computer Server"** or **"Server,"** as used herein is a computer that is attached to a dedicated network and serves many users.  A web server, for example, is a computer which hosts the data associated with a website.  That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser.  Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

    c.  **"Computer hardware,"** as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and

3

peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d. **"Computer software,"** as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

e. **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

4

f.  **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

g.  **Tablet**: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

h.  The "**Internet**" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.  "**Internet Service Providers**" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet

including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

j.  "**Internet Protocol address**" or "IP address" refers to a unique number used by a computer to access the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

k.  "The terms "**records**," "**documents**," and "**materials**," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic

6

or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital

video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards

("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory

calculators, electronic dialers, or electronic notebooks, as well as digital data files and

printouts or readouts from any magnetic, electrical or electronic storage device).

l.   **"Website"** consists of textual pages of information and associated graphic images.  The

textual information is stored in a specific format known as Hyper-Text Mark-up

Language ("HTML") and is transmitted from web servers to various web clients via

Hyper-Text Transport Protocol ("HTTP").

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

9.   As described above and in Attachment B, this application seeks permission to search for

records that might be found on electronic devices including cellular phones, in whatever

form they are found.  The warrant applied for would authorize the seizure of electronic

storage media or, potentially, the copying of electronically stored information, all under

Rule 41(e)(2)(B).

10.  *Probable cause.*  I submit that there is probable cause to believe records will be stored on

electronic devices including cellular phones, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

downloaded to a storage medium can be stored for years at little or no cost.  Even when

files have been deleted, they can be recovered months or years later using forensic tools.

This is so because when a person "deletes" a file on a computer, the data contained in the

file does not actually disappear; rather, that data remains on the storage medium until it is

7

overwritten by new data.  Depending on a variety of factors, a particular computer could easily not overwrite deleted files with new data for many months, and in certain cases conceivably ever.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

11. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the electronic devices including cell phones because:

8

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate

conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

12. *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As

explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

     b.    <u>Technical requirements</u>. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

     c.    <u>Variety of forms of electronic media</u>. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

13. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of electronic devices including cellular phones consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

14. As part of an undercover operation conducted by the FBI Richmond Child Exploitation
    Task Force (CETF), an online covert employee (OCE) used a covert social media account
    to target subjects willing to travel to the Richmond, Virginia area to engage in sexual
    conduct with a minor. The OCE set up a profile posing as an adult intermediary who had
    access to both a 9-year old male son and an 11-year old female daughter. The OCE posted a
    profile on an online platform and subsequently responded to subjects who indicated a desire
    to meet with the minors.

15. The OCE posted an undercover (UC) profile on Alt.com, an online network for members
    interested in alternative forms of sexual relationships and friendship. Users can bond over
    fetishes, kinks, and BDSM (Bondage, Discipline, Sadism, and Masochism), as well as
    explore the site's large stockpile of sexual videos, articles, and other content. The UC
    profile noted that the user was an adult female from Chesterfield, Virginia. It also included
    a list of kinks to include "Daddy/babygirl", "mom/son", "young/old," "Mommy/Daddy
    play" and "taboo family".

16. On April 12, 2021, an individual utilizing the username "hornywvdaddy" contacted the
    OCE through the UC profile on Alt.com (hereinafter referred to as "UC Mom" to protect
    the integrity of the OCE online profile). Hornywvdaddy initiated the conversation by
    saying: "Like your kinks, especially anal sex, bestiality, young old, and taboo family, and
    being watched. Would love to get acquainted and see if we can get something started
    between us." Shortly thereafter, hornywvdaddy agreed to chat with UC Mom on Google
    Hangouts and provided the email address needmorewv@gmail.com.

12

17. On April 13, 2021, UC Mom received an invitation to chat on Google Hangouts from needmorewv@gmail.com, who had a screen name "Eric B". Eric B and UC Mom began a conversation on Google Hangouts.

18. On April 14, 2021, Eric B expressed interest in incestuous sexual relationships, as well as having sex with UC Mom and her 11-year-old daughter. In the following chat exchange, Eric B explains his interest in incest, as well as an instance when he previously attempted to engage in a sexual relationship with his adult daughter:

**Eric B** - only thingd I have done are watersports, fisting, and daddy daughter role playyy
i tried to get my daughter to fuck me but she wouldnt do it so my incest options are role play amd 3sums with incestcouples
i came close to bestiality but i have no partner
**UC Mom** - How old was she when you tried to fuck her?

**Eric B** - about 22
she was in college
maybe 21

**UC Mom** - What happened?

**Eric B** - she rejected mya advances
so I bbacked off and dropped it

19. Later in the conversation, Eric B expressed interest in having sex with younger females to include UC Mom's 11-year-old daughter:

**UC Mom** - Not an issue I'm on the pill and my daughter hasn't started her period yet so it's nothing I worry about

**Eric B** - coool
i'd like to fuck both of you

**UC Mom** - She's used a dildo but still a virgin

**Eric B** - virgin would be great

**UC Mom** - I have a son too but he's never played with a man

**Eric B** – ok

**UC Mom** - He would watch his father fuck me and play with his sister though

13

**Eric B** - ok
sounds like a cool family
thats how i wish I done with oours

**UC Mom** - Thanks I wasn't sure what you were interested in and I have to be very careful talking about these things because of how muchtrouble I could get it
In

**Eric B** - i understand
very much
i have to very careful talking about it too
especiaally about younger girs
girls
i once wrote a paper about my philosopphy on incest
a couple years ago
**UC Mom** - How was that received?

**Eric B** - it was for personal concsumption
but I have writte similar stuff for fetlife

**UC Mom** - My daughter is 11 years old Is that too young for you?

**Eric B** - not if we keep it to ourselves

**UC Mom** - That goes without saying

**Eric B** - yes

20. On May 7, 2021, Eric B again indicated he wanted engage in sexual conduct with UC Mom

and her minor children:

**UC Mom** - What were you thinking?

**Eric B** - get involved sexually with you and your family

**UC Mom** - I know it's been awhile since we talked
You don't mind that she's 11 and he's 9 nine years old?

**Eric B** - no
can he get erection

**UC Mom** - He can but doesn't maintain it long

**Eric B** - i was 11 or 12 before i did

21. On May 12, 2021, Eric B expressed interest in traveling the Richmond, Virginia area to meet UC Mom, her 11-year-old daughter, and her 9-year-old son:

**Eric B** - hope i can see you soon

**UC Mom** - When were you thinking?

**Eric B** - later this month or in June

**UC Mom** - Sounds good

**Eric B** - if it can happen
i can come there if you are interested
and stay overnight

**UC Mom** - I like that
Do you want both kids here or just my daughter?

**Eric B** - noth depending on what you have in mind
Both

**UC Mom** - What were you thinking?

**Eric B** - he can watch or play with and his siter
with you and his sister

**UC Mom** - Ok
Did you have any ideas about what you wanted when you get here?

**Eric B** - i will take things as they come, but i would like to at least spend the night.
whatever you want to do with me and them
will she come to bed with us
sleep with us
i dont how she feels about a stranger
is everypne nude at your house

**UC Mom** - Sometimes we are nude but not everyday
She's very excited
She wanted to lose her virginity so badly

**Eric B** - i like being nude if we can be
if she joins in bed that will be cool

22.  Later that same day, Eric B sent a picture depicting a white male lying in bed holding his penis. The picture was followed by a message from Eric B saying "there is a pic" followed

by another message saying "you can show it to her if you like" in reference to the 11-year old daughter.

23. The conversation between Eric B and UC Mom continued into June 2021 and included exchanges about topics including, but not limited to, impregnating both UC Mom and her 11-year old daughter, him taking the daughter's virginity and introducing the her to anal sex, bestiality, and the use of sex toys with both UC Mom and the daughter. The following is an example of the conversation:

**Eric B** - i can bring all of mine
some may be only for you
what kind of toys do you have

**UC Mom** - I just have a dildo
What toys do you have?

**Eric B** - i have a double ended flexible dildo you can use with her to fuck each other at the same time
i have a strap on
i have a vibrating dildo and 9 inch thick silicone dildo that maybe you can use'
i have some butt pllugs various sizes, anal beads, bibrating bullet
vibrating
none of these are being used at my house

**UC Mom** - Sounds very nice and fun to use
I'm not sure what she'll be able to take

**Eric B** - we can use them all with all of you
we can find out
she should be able to use more after i fuck her

24. Additionally, Eric B discussed talking directly UC Mom's 11-year old daughter on Google Hangouts. UC Mom provided the email address of the minor daughter's persona (hereinafter referred to as UC Daughter):

25. On May 12, 2021, Eric B sent UC daughter a message on Google Hangouts. Eric B and the OCE, acting as UC Daughter, began a conversation on Google Hangouts, which included

talk about Eric B coming to Richmond to visit, as well as where UC Daughter would sleep

when Eric B was there:

**Eric B** - i dont know that means
do you ean sleep?

**UC Daughter** – Ya

**Eric B** - probably with your mom
where do you want me to sleep

**UC Daughter** - I can sleep with u guys

**Eric B** - if thats ok with your mom

**UC Daughter** - She won't care
She likes sleepin with me

**Eric B** - i will probably be having sex with her

26. On May 21, 2021, the following exchange occurred between Eric B and UC Daughter:

**UC Daughter** – Watcha doin

**Eric B** – playing solitaire on my co,puter
thinking about sex

**UC Daughter** – Like wut

**Eric B** – about what i;m going to do when i am with you and your mom

**UC Daughter** – Wut do u wanna do most

**Eric B** – fuck

**UC Daughter** – [cat emojis]

**Eric B** – would you sit on my lap at the dinner table

**UC Daughter** – Ya

**Eric B** – with everyone else watching

**UC Daughter** – Yaaaa y is that a big deal

**Eric B** – it would be arousing with you riding me naked

17

**UC Daughter** – W'd b naked?

**Eric B** – of course
how else would i be inside you

**UC Daughter** – Like sex when I'm sitting on your lap?

**Eric B** – of course

27. On June 15, 2021, Eric B and UC Mom discussed plans for Eric B to travel to Richmond

from his home in West Virginia on June 24, 2021. Eric B. also provided a telephone number

of 703-963-6752 and stated his name is Eric. The following exchange then occurred

pertaining to Eric's visit to Richmond and engaging in sex with both UC Mom and UC

Daughter:

**Eric B** – i know, i could do both of you
how small is she

**UC Mom** – Small enough
You look like a big man in your pictures

**Eric B** – i am
i willoverwhelm her

**UC Mom** – Perfect

**Eric B** – my cock will fill her up

**UC Mom** – You'll have to slowly wrk it in then

**Eric B** – i will be kind to her
if i need lube i will use it
but i will go all the way in

28. On June 19, 2021, Eric B and UC Mom continued the conversation about what will happen

when Eric B travels to Richmond on June 24, 2021:

**Eric B** -  , thursday night we may sleep a little friday we will spend the day with more sex i
have spent a weekebd with one woman having sex, but that will nothing compared to you
two i guess satirday morning i willl fuck both of you at least once more before i go home
does this sound like a good plan

**UC Mom** - Sounds amazing

18

I hope we keep up with you

**Eric B** - i will have trouble keeping up two horny women but i will fuck both of you alot and hope at one of your holes will always be available when i need it day or night hope both of you will like sucking my cock too i will have my toys and lube can we talk on the phone some time before Thursday

Later in the conversation, Eric B stated he is 72 years old and sent UC Mom a picture of himself. He also stated he planned to arrive in Richmond at approximately 11AM on June 24, 2021, and would be driving a gray Toyota 4Runner.

29. On June 22, 2021, a female law enforcement officer acting in an undercover capacity contacted Eric B. via the telephone number he provided previously in the chats. An individual who identified himself as Eric answered on the second call attempt. The conversation lasted approximately five minutes, during which time Eric discussed his plans to travel to Richmond on Thursday, June 24, 2021. Eric agreed to meet at the Red Robin at the mall and asked the UC to send him the address. Eric also stated it would take approximately four hours to get to Richmond from his location and that he planned to be there at approximately 11AM.

30. Investigators used personally identifiable information from Hornywvdaddy's Alt.com profile, information volunteered during the chat sessions on Alt and Google Hangouts, information obtained from various open source and FBI database queries to identify Eric B as ERIC E. BRAGG, date of birth (DOB) August 7, 1948, social security number XXX-XX-9182, residing at the PROPERTY. The list of vehicles registered to BRAGG included a 2020 Toyota 4Runner, WV license plate W33357.

31. A subpoena to Google, Inc. for the account needmorewv@gmail.com revealed the following subscriber information:

**Name:** Eric B
**E-mail:** needmorewv@gmail.com
**Alternate e-mail:** eebragg@yahoo.com

19

32. A subpoena to AT&T for the telephone number provided in the chats, 703-963-6752,

revealed the following information:

**Billing Party**

**Name:** D.E. (full name provided in billing information)
**Credit Address:** 12307 PURCELL RD, MANASSAS, VA 20112

**User Information**

**MSISDN:** (703) 963-6752
**IMSI:** 310410146783236
**MSISDN Active:** 07/22/2009 - Current
**Name:** ERIC BRAGG
**User Address:** 12307 PURCELL RD, MANASSAS, VA 20112
**Service Start Date:** 07/22/2009
**Contact Name:** ERIC BRAGG

33. On June 24, 2021, law enforcement officers arrested ERIC BRAGG when he arrived at the

Red Robin located at 11500 Midlothian Turnpike #428, Richmond, Virginia 23235, in the

Eastern District of Virginia, which was the meeting spot arranged during conversations

between BRAGG and the OCE. Officers took BRAGG into custody as he approached the

designated meeting spot. On BRAGG's person at the time of the arrest was a West Virginia

driver's license. BRAGG stated he had traveled to the designated meeting location from his

residence in West Virginia. BRAGG admitted that he traveled to the Richmond area to meet

with UC Mom but denied plans to engage in sexual activity with UC Daughter.

34. During a custodial interview following his arrest, BRAGG provided his home address as the

address associated with the PROPERTY. BRAGG also stated he used a computer to

communicate with UC Mom and UC Daughter. BRAGG denied having any images or

videos constituting Child Sexual Abuse Material (CSAM) on the computer.

35. On June 25, 2021, law enforcement officers conducted a search on BRAGG's vehicle, a

2020 Toyota 4Runner, WV license plate W33357, pursuant to a Federal search warrant.

Several items, including a suitcase containing sex toys, Viagra, and lubes, and an AT&T cellular phone were found in the vehicle. BRAGG's computer was not located in the vehicle at the time of the search.

## **CONCLUSION**

36. Based on the forgoing, I submit that this affidavit supports probable cause for a warrant to search the PROPERTY described in Attachment A for evidence and instrumentalities of violations of 18 U.S.C. § 2422(b) and 18 U.S.C. § 2423(b) as further described it Attachment B.

Respectfully Submitted,

Matthew Marasco
Special Agent
FBI Richmond Field Office

SEEN

_____/s/_____
Heather Mansfield
Assistant United States Attorney

Subscribed and sworn to in accordance with 30
Fed. R. Crim. P. 41 by telephone on June 24, 2021

Michael John Aloi
U.S. Magistrate Judge
NDWV